UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 10-4830(DSD/JJK)

Gaye L. Larson,

       Plaintiff,

v.                                                          **ORDER**

Janet Napolitano, Secretary,
U.S. Department of Homeland
Security,

       Defendant.


    Kent B. Gravelle, Esq., Gravelle Law Office, P.O. Box
    24563, Edina, MN 55424, counsel for plaintiff.

    Ana H. Voss, Esq., Mary J. Madigan, Esq., United States
    Attorney's Office, 300 South Fourth Street, Suite 600,
    Minneapolis, MN 55415, counsel for defendant.


    This matter is before the court upon the motion for summary judgment by defendant Janet Napolitano, Secretary, U.S. Department of Homeland Security (DHS). Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion.


**BACKGROUND**

    This dispute arises out of the employment of plaintiff Gaye L. Larson by the DHS. Larson began working as a Personnel Security Assistant for Immigration and Customs Enforcement in April 2004. Supervision of Larson's position was transferred to Customs and

Border Protection in November 2004.[1]  Due to agency restructuring, Larson was reassigned to an HR Assistant position on October 1, 2006.  See Voss Decl. Ex. 1a, at 53; Larson Dep. 40:2-7.  At the time of her transfer, Larson had been at grade GS-08, but there were no GS-08 HR Assistants positions in Minnesota.  Larson Dep. 31:4-7; 32:14-33:1.  DHS created a position for Larson and paid her at the GS-08 level.  Id. 37:1-10.  Larson worked in this position until accepting partial-disability retirement in May 2008.  Compl. ¶ 70.

Before beginning her position as an HR Assistant, Larson was assigned to clean lektriever filing systems for two weeks.  See id. ¶ 48.  Thereafter, Larson was diagnosed with a sprained shoulder, which she attributes to her work cleaning the lektrievers.

Larson submitted a claim to the Office of Workers' Compensation (OWCP) in January 2007.  Id. at 347-48.  The OWCP accepted the claim in February 2007.  Id. at 349.  A Report of Work Ability (RWA), signed by her treating physician, diagnosed Larson with a "sprain[ed] shoulder/arm NOS and sprain[ed] thoracic region" and instructed her to carry more than twenty pounds only occasionally, not to reach above her shoulders or far in front of her body and to perform no repetitive or extreme neck movements. See Voss Decl. Ex. 1b, at 334.  A March 14, 2007, RWA retained the

---

[1] Immigration and Customs Enforcement and Customs and Border Protection are agencies within DHS.

same restrictions; it was modified in April 2007 and further limited neck movements. Id. at 333-36. On May 23, 2007, Larson's RWA instructed that she "[l]imit data entry to 20/hr/wk in half shifts." Id. at 341.

In January 2007, Larson also notified her supervisor, Gweneth Wild, that she was experiencing carpal tunnel pain. Id. at 605. In response, Wild asked Larson to "bring in a slip from your doctor identifying what you can and cannot do." Id. On December 18, 2007, Larson submitted a RWA for carpal tunnel syndrome. Id. Ex. 1a, at 215. Larson filed an OWCP claim for carpal tunnel syndrome in December 2007. See id. Ex. 3. The OWCP accepted Larson's claim for carpal tunnel syndrome in her right hand in January 2008. Id. Ex. 4.

On August 2, 2007, Larson applied for an HR Specialist position. Id. Ex. 1a, at 60. Four positions were available. See id. at 60-61. The job announcement did not list a minimum education requirement. Id. Ex. 1b, at 359-66. Larson was not promoted to the HR Specialist position. Compl. ¶ 41. Of the four applicants who received promotions (collectively, Selectees), all were under the age of forty. See id.

On August 20, 2007, Larson filed an EEOC complaint with the DHS. See id. ¶ 5. The administrative law judge dismissed the complaint on December 31, 2008, and the DHS issued its final agency decision on September 27, 2010. Id. ¶¶ 8, 12. On December 7,

3

2010, Larson filed the instant action, alleging disability discrimination under the Americans with Disabilities Act (ADA), retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), age discrimination in violation of the Age Discrimination in Employment Act (ADEA) and civil conspiracy.[2] The DHS moves for summary judgment.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth

---

[2] Larson abandoned her civil conspiracy claim prior to oral argument. See Pl.'s Mem. Opp'n 36-37.

4

specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists — or cannot exist —  about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

## II.  Disability Discrimination

The ADA prohibits employers from discriminating against individuals on the basis of disability.  See 42 U.S.C. § 12112. The court analyzes ADA claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 n.4 (8th Cir. 2007).  To establish a prima facie case of disability discrimination, a plaintiff must show that (1) she was disabled; (2) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered an adverse employment action due to her disability.  See Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003).  The term "disability" means a physical or mental impairment that substantially limits one or more major life activities.  See 42 U.S.C. § 12102.  Congress amended the ADA effective January 1,

5

2009, to "supersede the Supreme Court's prior admonitions to consider the ameliorative effects of mitigating measures ... and to construe narrowly the ADA's 'substantially limits' language" when determining whether a person is disabled. Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 904 n.2 (8th Cir. 2010) (citations omitted). The court analyzes claims under the pre-amendment standard when, as here, the events that give rise to the suit occurred prior to January 1, 2009. See Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 518 n.5 (8th Cir. 2011).

An impairment is substantially limiting if a person is "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to the average person." Id. at 903 (citing 29 C.F.R. § 1630.2(j)(1)(ii)). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I); see Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 733 (8th Cir. 2010). The Eighth Circuit has also considered "[s]itting, standing, lifting, and reaching" to be major life activities. Weber v. Strippit, Inc., 186 F.3d 907, 913 (8th Cir. 1999). The terms "major life activities" and "substantial limitation" are strictly interpreted and establish a demanding disability standard. See Gretillat v. Care Initiatives, 481 F.3d 649, 652 (8th Cir. 2007) (citation omitted).

6

Larson argues that her ailments, which include carpal tunnel syndrome, thoracic and shoulder pain, arthritis, osteoarthritis, hypothyroidism and allergies, all support a finding of disability.[3] In response, the DHS argues that Larson has not met her burden to show that these impairments substantially limit major life activities.

Regarding carpal tunnel syndrome, Larson explained that she "drop[s] things" and has to "use a plier[s] to pull the tab" when opening a coffee container. Larson Dep. 83:21-84:7. Further, due to a lack of strength in her hands, Larson must use scissors to open bags of cheese or chips. Id. at 84:8-11. Larson also explained that although she can "do [her] hair ..., [she] better do it quick because it's going to start to hurt real fast." Id. at 85:9-10. Larson stated that "anytime you do anything for any length of time, you're going to have pain," but notes no other specific activities that are affected by carpal tunnel syndrome. Id. at 84:21-22.

As to her shoulder sprain, Larson explained that "it interacts with the arthritis," making it difficult to both sit and sleep. Id. at 86:1-13. Larson also notes that it is "[p]retty hard to

_____

[3] Larson does not specify what major life activity is impaired. For purposes of this motion, that court construes Larson's argument as an inability to "perform[] manual tasks." See 39 C.F.R. § 1630.2(I). Larson does not argue that she is unable to perform the major life activity of working. See Larson Dep. 10:15-12:5 (explaining that she is currently employed as a customer service representative).

wash [her] back" when bathing, thereby requiring the use of a brush.  Id. at 87:12-19.  Larson also explains that her osteoarthritis affects her balance, allergies hinder her ability to sleep and hypothyroidism causes sleepiness.  Id. at 88:15-92:17.[4]

Larson argues that her situation is analogous to the plaintiff in Jotblad v. City of St. Paul, No. 04-4009, 2006 WL 208780 (D. Minn. Jan. 25, 2006).  In Jotblad, the plaintiff had such severe carpal tunnel syndrome that her right thumb was "almost useless." Id. at *3.  In dicta, the Jotblad court found plaintiff disabled. Id.  As in Jotblad, "[a]n individualized assessment of the effect of an impairment is ... necessary when the impairment is one whose symptoms vary widely from person to person.  Carpal tunnel syndrome ... is just such a condition."  Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002).  In other words, "the determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis."  Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 949 (8th Cir. 1999).

The present case differs from Jotblad.  Larson does not regularly struggle to brush her teeth.  See Larson Dep. 92:18-25. And although she must take care when holding fragile items such as

---

[4]  Larson's opposition brief does not address how osteoarthritis, allergies and hypothyroidism significantly affect a major life activity.  At oral argument, Larson indicated that she did not wish to waive her disability claim as to these ailments. As such, the court considers the effect of these conditions as they interact with carpal tunnel syndrome and shoulder pain.

glassware or dishes, nothing in the record indicates that she is
unable to do so.  Id. 94:4-13.  Larson, albeit with some
discomfort, can do her hair and vacuum.[5]  See id. 85:9-10; 94:14-
20.  Moreover, although Larson uses pliers to open coffee cans, a
scissors to open bags of food and a brush for bathing, her reliance
on these adaptive measures largely, if not completely, mitigates
the difficulty of performing these manual tasks.  Indeed,
"impairments that are corrected by mitigating measures do not
'substantially limi[t] a major life activity.'"  Casey v. Kwik
Trip, Inc., 114 F. App'x 215, 219 (7th Cir. 2004) (alteration in
original) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471,
482-83 (1999)); see Brunke v. Goodyear Tire & Rubber Co., 344 F.3d
819, 822 (8th Cir. 2003) (citation omitted).  Viewing the facts in
the light most favorable to Larson, the court concludes that no
reasonable juror could find that Larson is substantially limited in
a major life activity.  Therefore, Larson is not disabled, and
summary judgment is warranted.[6]

---

[5] In her opposition brief, Larson argues that she is unable to
reach above her head.  See Pl.'s Mem. Opp'n 18-19.  Her deposition
testimony conflicts this statement.  See Larson Dep. 85:9-10 ("I
can do my hair, but I better do it quick because it's going to
start to hurt real fast.").  But see id. 86:19-21 ("There are
certain things that you cannot do.  Reaching above my head, like I
had said doing my hair.").

[6] The court also notes that Larson failed to exhaust her
administrative remedies on most, if not all, of her disability
discrimination claims.  "[E]mployees of federal government agencies
who believe that they have been discriminated against 'must consult
(continued...)

### III.   Failure to Accommodate

Larson next argues that the DHS failed to accommodate her alleged disability.  Failure-to-accommodate claims are subject to a modified burden-shifting framework.  See Mershon v. St. Louis Univ., 442 F.3d 1069, 1074 (8th Cir. 2006).  A failure-to-accommodate claim requires a plaintiff to show that (1) she is a qualified individual with a disability, and (2) the employer knew of the disability but failed to provide reasonable accommodations through an interactive process.  See Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc., 439 F.3d 894, 900 (8th Cir. 2006).

The court has already determined that Larson is not disabled for purposes of the ADA, and therefore her claim fails.  See Kirkeberg, 619 F.3d at 906 n.4.  Larson's claim also fails because she cannot demonstrate that the DHS failed to engage in an interactive process.  To demonstrate that an employer failed to engage in an interactive process, an employee must prove:

> (1) the employer knew about the employee's
> disability; (2) the employee requested
> accommodations or assistance for his or her

---

⁶(...continued)
a[n EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter.'" Bailey v. U.S. Postal Serv., 208 F.3d 652, 654 (8th Cir. 2000) (alteration in original) (quoting 29 C.F.R. § 1614.105(a)).  An employee "must initiate contact with a Counselor within 45 days" of the alleged discriminatory event.  See 29 C.F.R. § 1614.105(a)(1).  Larson did not contact a counselor until August 20, 2007.  Compl. ¶ 40.  Therefore, all discrete and independent acts occurring outside the forty-five day window are barred.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

disability; (3) the employer did not make a
good faith effort to assist the employee in
seeking accommodations; and (4) the employee
could have been reasonably accommodated but
for the employer's lack of good faith.

Fjellestad, 188 F.3d at 952.

### A.   Employer Knowledge

An employee need not make a formal written request for
accommodation, but she must provide enough information to the
employer so that it "can be fairly said to know of both the
disability and desire for an accommodation." Ballard v. Rubin, 284
F.3d 957, 962 (8th Cir. 2002) (internal quotation marks omitted).
Larson argues that the submission of her monthly RWAs made the DHS
aware of her alleged disability.  Specifically, Larson explains
that the restrictions listed in her RWA - lifting no more than
twenty pounds, limiting neck movement, not reaching above her head
and performing no more than twenty hours of data entry - put the
DHS on notice.

An RWA is a one-page document outlining, among other things,
the date of treatment, diagnosis, restrictions and treatment plans.
See e.g., Voss Decl. Ex. 1b, at 334 (RWA dated January 30, 2007).
The RWA also requests that the treating physician determine whether
the ailment is likely to result in "permanent partial disability"
(PPD).  See id.  Larson's first four RWAs indicated that PPD was
unlikely.  Id. at 334-38.  On May 5, 2007, Larson's supervising
physician listed the likelihood of PPD as "unknown."  Id. at 340.

Wild indicated that she was aware of Larson's medical conditions:

> Q:   When did you first realize that Ms. Larson needed
>      an accommodation for her medical condition?
>
> A:   When she first needed it would have been when we
>      got the official statement from her doctor.
>
> Q:   And approximately what month and year was that?
>
> A:   May of 2007.

Wild Dep. 96:15-20.

Larson also informed Wild through email in January 2007 that she was having trouble performing data entry due to carpal tunnel syndrome.  See id. at 605.  Wild responded in a little over an hour, asking Larson to "bring in a slip from your doctor identifying what you can and cannot do."  Id.  Larson's response indicated that she could "do data entry; I am just not real fast."  Id.  Larson did not submit a RWA for carpal tunnel syndrome for almost another eleven months.  Id. Ex. 1a, at 215.

Larson's evidence that the DHS was on notice of her alleged disability is not particularly strong, but viewing the facts in a light most favorable to her, a reasonable juror could conclude that the DHS was aware of Larson's claimed disability.[7]

---

[7] Larson raises several allegations of failure to accommodate, including non-receipt of an ergonomic chair and a requirement to perform more than twenty hours of data entry per week.  For purposes of this motion, the court accepts the truth of these allegations.

B.    **Employer Good Faith**

Employers may demonstrate a good-faith effort to accommodate by "meeting with the employee who requests accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the employee's request is too burdensome." Fjellestad, 188 F.3d at 953 n.7 (citation omitted).  The employee must also work with the employer in good faith to help determine what accommodation is necessary.  See Cannice v. Norwest Bank Iowa N.A., 189 F.3d 723, 727 (8th Cir. 1999) (citation omitted); see also E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc., 491 F.3d 790, 795 (8th Cir. 2007) ("Our case law has established a shared responsibility between employers and employees to resolve accommodation requests.").

Larson cannot demonstrate that the DHS failed to engage in the interactive process.  Although Larson informed Wild of pain associated with carpal tunnel syndrome in January 2007, she did not submit corresponding medical documentation until December 17, 2007. See Voss Decl. Ex. 3, at 24.  Thus, at the time of Larson's EEOC Complaint, the DHS was only aware of Larson's shoulder sprain, and

13

it was reasonable for the DHS to request additional information regarding Larson's alleged disabilities and requested accommodations.  Larson failed to provide this information.

On October 25, 2007, Larson's attorney, Chris Attig, informed Assistant EEO Director Darlene Sedwick that the DHS should not contact Larson directly and that all inquiries should be directed to Attig.  See Voss Decl. Ex. 1b, at 903.  In response, Sedwick informed Attig that communications regarding the EEO Complaint process would be directed to him, but that Larson, as a DHS employee, was required to engage in an interactive process.  Id. On November 8, 2007, Larson declined an in-person meeting to discuss her accommodation request with EEO Manager Lisa Culpepper. Id.  On January 8, 2008, Culpepper contacted Larson through email requesting that she "describe [her] medical condition(s) requiring an accommodation, that [she] describe the accommodation(s) [she was] requesting, and that [she] explain how the requested accommodation(s) would assist [her] in performing the essential duties of [her] position."  Id. at 905.  Larson refused to answer the questions and again directed Culpepper to her attorney.  Id. Larson's attorney did not respond to Culpepper's email.  Id.  As such, Larson cannot demonstrate that the DHS failed to make a good faith effort to accommodate.  Therefore, for this additional reason, dismissal of Larson's failure-to-accommodate claim is warranted.

14

## IV.  Retaliation

Larson also alleges several instances of retaliation, including that her former CBP supervisor downgraded her duties, told her to look for work elsewhere, assigned her remedial tasks and eventually ordered her transfer to an HR Assistant position in October 2006.  See Compl. ¶¶ 29-41.  These claims all occurred outside the forty-five day window for reporting retaliation claims.  See 29 C.F.R. § 1614.105(a)(1).  Larson argues, however, that these acts are exempt from the applicable statute of limitations, because they are part of a continuing violation.  The court disagrees.  Indeed, each alleged instance was a separate, actionable employment practice.  See Bertz v. Chertoff, 578 F.3d 929, 937-38 (8th Cir. 2009).  Therefore, these retaliation claims are dismissed.[8]

Larson next claims that the DHS's failure to promote her to an HR Specialist position was retaliatory.  "Title VII makes it unlawful for an employer to discriminate against an employee because she has 'opposed any practice made an unlawful employment practice,' or has made a charge or participated in an investigation or proceeding under the statute."  Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 416 (8th Cir. 2010) (quoting 42 U.S.C.

---

[8] Larson also alleged retaliation based on her transfer to a smaller cubicle and random drug test.  See Compl. ¶¶ 65, 68. Larson waives these claims by not addressing them in her opposition memorandum.  Further, "[m]ere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action."  Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005).

§ 2000e-3(a)). Larson's failure-to-promote claim, without any evidence of direct retaliation, is properly analyzed under the McDonnell Douglas framework. See Guimaraes v. SuperValu, Inc., 674 F.3d 962, 978 (8th Cir. 2012).

An employee has the initial burden to establish a prima facie case of retaliation. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005). To establish a claim of retaliation, an employee must present evidence "(1) that she engaged in a protected activity, (2) that the employer took an adverse action against her, and (3) that a causal connection exists between the two." Bonn v. City of Omaha, 623 F.3d 587, 590-91 (8th Cir. 2010) (citations omitted). "If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action." Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1078 (8th Cir. 2010) (citation omitted). "The burden then shifts back to the employee to put forth evidence of pretext, the ultimate question being whether a 'prohibited reason, rather than the proffered reason, actually motivated the employer's action.'" Id. (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)).

Larson cannot make a prima facie case for retaliation, because there is no evidence that the selection committee had knowledge of her EEOC complaint at the time it filled the HR Specialist positions. Compare Voss Decl. Ex. 1b, at 380 (HR Specialist

selections occurred on September 14, 2007), <u>with</u> <u>id.</u> Ex. 1a, at 48 (EEOC contacts Wild regarding accommodation request on September 19, 2007).   Indeed, "a mere coincidence of timing can rarely be sufficient to establish a submissible case" of retaliation. <u>Thompson v. Bi-State Dev. Agency</u>, 463 F.3d 821, 826 (8th Cir. 2006) (citation and internal quotation marks omitted).   Therefore, dismissal of Larson's retaliation claim is warranted.[9]

## V.   Age Discrimination

Larson next claims that the DHS failed to promote her due to age discrimination.   "The ADEA prohibits discrimination against employees, age 40 and over, because of their age."   <u>Rahlf v. Mo-Tech Corp.</u>, 642 F.3d 633, 636–37 (8th Cir. 2011) (citing 29 U.S.C. §§ 623(a)(1), 631(a)).   Without direct evidence of age discrimination, the court analyzes her claim under <u>McDonnell Douglas</u>.   <u>See</u> <u>Haigh v. Gelita USA, Inc.</u>, 632 F.3d 464, 468 (8th Cir. 2011).

To establish a prima facie case of age discrimination, an employee must present evidence that she belonged to the protected class, she was qualified for the position for which she applied, she was rejected and the employer "filled the position with an

---

[9] Larson's argument that her lack of promotion was the result of retaliation for her son's whistleblower complaint against director of Minneapolis hiring, Doug Halvorson, is without merit. <u>See</u> <u>Bakhtiari v. Lutz</u>, 507 F.3d 1132, 1137 (8th Cir. 2007) (explaining that protected activity must be protected under Title VII).

individual sufficiently younger to permit the inference of age discrimination." <u>Hammer v. Ashcroft</u>, 383 F.3d 722, 726 (8th Cir. 2004) (citation omitted). "Once a plaintiff establishes a prima facie case, the burden shifts to [the employer] to provide a legitimate, nondiscriminatory reason for the [adverse employment action]." <u>Gibson v. Am. Greetings Corp.</u>, 670 F.3d 844, 856 (8th Cir. 2012) (alterations in original) (citation and internal quotations omitted). "Finally, if [the employer] provides such a reason, the burden returns to [the plaintiff] to prove [the employer's] reason was mere pretext for discrimination." <u>Id.</u> (alterations in original) (citation omitted). To succeed in an age discrimination claim, Larson "must show, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." <u>Id.</u>

The government concedes that a prima facie case for age discrimination is present but argues that legitimate, nondiscriminatory reasons for non-selection exist. <u>See</u> Def.'s Mem. Supp. 31. To fill the HR Specialist positions, Halvorson had "subordinate supervisors provide [him] with written recommendations justifying their recommended selections." Voss Decl. Ex. 1a, at 196 (Halvorson Decl.). For example, Karen Dickison was recommended based on her Master's degree in industrial organizational psychology, with an emphasis in human resources. <u>Id.</u> Ex. 1b, at 272 (Traxler Decl.). Further, Dickison was eligible for "a non-

competitive   excepted   appointment   under   a   disability   hiring
authority." Id. at 278 (Rademan Decl.).

Although she did not have a college degree, Cindy Fremstad was
recommended due to the relevant experience obtained while working
for more than a year in the unit in which she became a supervisor.
Id.   Sarah Hobbes was recommended due to her previous human-
resources experience and relevant work experience in the unit in
which she become a specialist.   Id. at 272 (Traxler Decl.).
Finally, Erika Bloomquist was recommended due to her more than four
years of relevant work experience.   Id. at 297 (Korak Decl.).
Larson, on the other hand, had worked in her HR Assistant position
for less than one year and had limited prior human-resources
experience. See Gravelle Decl. Ex. U. Given these recommendations
and Larson's limited HR experience, the DHS had legitimate, non-
discriminatory reasons for not hiring Larson.

"To show pretext, [Larson] must point to enough admissible
evidence to raise genuine doubt as to the legitimacy of the
defendant's motive, even if that evidence [does] not directly
contradict or disprove [the] defendant's articulated reasons for
its actions." Barber v. C1 Truck Driver Training, LLC, 656 F.3d
782, 793 (8th Cir. 2011) (citation and internal quotation marks
omitted).  As an initial matter, the court notes that because the
open positions required "no specialized education requirements,"
all Selectees met the minimum qualifications for the position. See

19

Voss Decl. Ex. 1b, at 359-66 (CBP job positing).  Nevertheless, Larson argues that she was more qualified than the Selectees due to her bachelor's degree, with a triple major in education, English and psychology.   But given the nature of the HR Specialist position, Larson's degree does not necessarily make her more qualified.   In fact, she acknowledged that Hobbes was "pretty qualified" despite not possessing a bachelor's degree.  Larson Dep. 156:25.  Further, Larson's prior teaching experience and personal security clearance are not relevant to the HR Specialist position. See Voss Decl. Ex. 1b, at 281 (Rademan Decl.).

Larson also argues that her written test score is evidence of pretext.   Larson scored higher than the Selectees and received a "superior" score of "28/30."  See Gravelle Decl. Ex. T.  Nine other non-Selectees, however, also received a "superior" score.   Id. Further, the written test score is only one metric in the interview process.   The other five categories are scored during a structured interview process:

> The structured interview process is essentially an oral exam that presents applicants with various scenarios that are drawn from real world situations and asks them to tell a panel of 2 or 3 trained evaluators how they would handle themselves in the given situation.   Their responses are rated according to standard criteria that seeks to measure in a structured, standardized way various competencies that have been determined through job analysis to be important to an employee's successful performance on the job.

20

Voss Decl. Ex. 1a, at 196 (Halvorson Decl.).  Larson's answers to interview questions were characterized as "negative and sharp." <u>Id.</u> Ex. 1b, at 275 (Traxler Decl.).  Thus, Larson's written test score, which was one metric out of six in the structured interview process, does not establish pretext.  Therefore, Larson has not presented sufficient evidence to allow a reasonable jury to determine that age was the "but for" cause of her non-promotion, and dismissal of this claim is warranted.[10]

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [ECF No. 15] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 24, 2012

s/David S. Doty
David S. Doty, Judge
United States District Court

---

[10] The court does not consider Larson's allegations of nepotism.  Even accepted as true, such evidence would not establish that Larson's non-selection was due to age discrimination in violation of the ADEA.